**UNITED STATES of America**

v.

**Hubert Geroid BROWN, aka H. Rap Brown, aka R. Hall, aka R. H. Brown.**

**Crim. No. 30966.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Feb. 28, 1968.

Louis LaCour, U. S. Atty., Gene Palmisano, First Asst. U. S. Atty., New Orleans, La., Marshall Golding, Atty., Dept. of Justice, Washington, D. C., for the United States.

William M. Kunstler, New York City, Murphy Bell, Baton Rouge, La., for defendant.

MITCHELL, District Judge.

The defendant, Hubert Geroid Brown, also known as Rap Brown, was indicted for transporting a firearm in interstate commerce while under indictment in the State of Maryland for a crime punishable by imprisonment for a term exceeding one year. Defendant filed a motion challenging the constitutionality of the composition of the Grand Jury which indicted him.

The Court makes the following findings of fact and conclusions of law.

## I

### FINDINGS OF FACT

1. In December, 1966, the judges of this Court, en banc, directed that the existing jury list for the New Orleans Division of this District be totally purged and a new list be compiled by the clerk and jury commissioner. The latter were given detailed, non-discretionary instructions that left them with merely ministerial functions. This action was taken in a good faith attempt to improve the representative quality of juries in this Division and to conform to the precepts laid down by the Court of Appeals for this Circuit in Rabinowitz v. United States.[1]

2. The old jury list had been limited by order of Court, dated October 8, 1948, to residents of the parishes of Jefferson, Orleans, Plaquemines, St. Bernard and St. Tammany. By order dated January 20, 1967, it was directed that jurors additionally be chosen from the parishes of St. Charles and St. John the Baptist. The judges of this Court determined that the seven parishes would yield a jury list that would constitute an adequate cross-section of the Division from the standpoint of urban and rural population, while at the same time not incurring unnecessary expense or unduly burdening with jury service those citizens residing in parishes from which transportation to New Orleans (the sole place in which the Court for this Division sits) is difficult and time-consuming. This determination was made in accordance with the mandate of 28 U.S.C. § 1865(a).

3. The judges also determined that names for the jury list be obtained solely by the selection at random of names from the voter registration lists of the aforesaid seven parishes (including the Federal Registrar's list for Plaquemines Parish). The judges considered the possibility of obtaining names from other sources, either in the first instance or to supplement the voter registration lists, but they concluded that selection of names at random from voter registration lists would provide a representative cross-section of the adult population of the seven parishes and that use of this method would preclude any exercise of subjective judgment by the clerk and jury commissioner. In reaching this conclusion, the judges satisfied themselves that—except in Plaquemines Parish, where the state registration list was to be supplemented by the Federal Registrar's list—there is no impediment to any qualified citizen registering to vote. They also took into consideration the fact that the Judicial Conference of the

United States had recently recommended that a system of jury selection using random selection of names from voter registration lists be adopted by all Federal courts and that proposed legislation establishing that system for all Federal courts was then pending before Congress.

4. Certain judges undertook the task of obtaining the voter registration lists from the seven parishes and having them delivered to the clerk, who was directed to abstract therefrom every hundredth name starting with the first name on each list and thereafter to send jury questionnaires to those persons. The clerk commenced using each list or part thereof as it was received. Due to the magnitude of the task, four temporary employees were hired by the clerk's office to assist in abstracting the names from the voter registration lists and sending the questionnaires.

5. The judges directed that, if a returned questionnaire indicated on its face a statutory disqualification, the person returning the questionnaire could be rejected for jury service by the clerk and jury commissioner; but that, if the questionnaire left a question as to the statutory qualification of the person returning it, or if the person asked to be excused from jury service, the questionnaire must be referred to one of the judges for determination as to whether the person would be placed upon the jury list. The clerk and jury commissioner kept and continue to keep a master list, by number, of all questionnaires sent out, cross-referenced to the voter registration lists; this master list indicates, as to each questionnaire, whether it was returned, what disposition was made in regard to the person returning it, and pertinent descriptive data in regard to each such person.

6. On May 15, 1967, the grand jury that indicted defendant herein and a new petit jury venire were drawn from the newly reconstituted jury list as it then stood. This action was taken at that time because both the old grand jury and

petit jury venires had been held beyond their terms, as a result of which the clerk's office had received complaints from numerous jurors. However, the clerk and the jury commissioner continued after that date to select names from the voter registration lists, mail questionnaires, and add names of qualified persons to the jury list. This process is a continuing one, which is still going on. As additional names are required, questionnaires are sent to every one hundredth name on each list beginning with the fifth name on each list. Since the voter lists are in alphabetical order, in this way (selection of names one and five), the selection of persons from the same household is avoided.

7. At the time the May 15, 1967 grand jury was drawn, 4,759 questionnaires had been mailed by the clerk and jury commissioner. Two selections of every hundredth name had been made from the registration lists for the parishes of Plaquemines, St. Bernard, St. Charles and St. Tammany, one selection had been made from the registration list for Orleans Parish, and one selection and two-fifths of a second selection had been made from the registration list for Jefferson Parish.

8. No selections had been made at that time from the registration list for St. John the Baptist Parish and the Federal Registrar's list for Plaquemines Parish, but this failure was inadvertent and excusable. The clerk relied upon the judges to provide him with the necessary lists, and assumed that he had received all that he was supposed to use, discovering only after the grand and petit jury venires were drawn that the list from St. John the Baptist Parish was missing. The judge who had undertaken to obtain the list for St. John the Baptist Parish made a request therefor to the registrar of said parish at the same time that he made similar requests to other parish registrars. Although the parish registrar promised that the list would be forwarded, he thereafter forgot to send it. With respect to Plaquemines Parish,

both the judge who had undertaken to obtain the list and the Clerk of this Court assumed, erroneously, that the list obtained included the Federal Registrar's list. The two missing lists have since been obtained and put into use as part of the jury selection procedure.

9. By the time of the hearing on this motion, the second selection from the registration list for Jefferson Parish had been completed, two selections had been made from the registration list for St. John the Baptist Parish and the Federal Registrar's list for Plaquemines Parish, the second selection from the registration list for Orleans Parish was being completed. It was the intention of the clerk to complete this latter, second selection before commencing a third selection from the registration list of any other parish.

10. A racial analysis, on a parish by parish basis, of the persons to whom the initial 4,759 questionnaires were sent, discloses that a random selection from voter registration lists of the type undertaken here yields racial proportions that reflect, with only minor and statistically insignificant variations, the racial proportions of those registered to vote in each parish.

11. Non-whites comprise 27.6% of the adult population of the seven parishes and 19.23% of the persons registered to vote therein (including those listed by the Federal Registrar in Plaquemines Parish). Thus the voter registration lists used herein presently provide a source for jury selection in which adult non-whites are underrepresented by 30.5%. Phrased another way, for every ten adult non-whites to whom questionnaires would be sent if absolute proportional representation were to be achieved, seven are calculated to receive questionnaires through use as a source of the voter registration lists presently at hand. The underrepresentation of adult non-whites is calculated to vary from 3.4% in St. Charles Parish to 54.3% in Plaquemines Parish, and is calculated to be 22.6% in Orleans, the most populous parish which contains eighty percent* of the adult non-white population of the seven parishes.

12. Non-whites comprise 23.12% of the literate adult population of the seven parishes (computed on the assumption that persons with no more than four years of schooling are functionally illiterate) and 18.32% of the literate persons registered to vote therein (including those listed by the Federal Registrar in Plaquemines Parish). Thus the voter registration lists used herein presently provide a source for jury selection in which literate adult non-whites are underrepresented by 20.8%. Phrased another way, for every five literate adult non-whites to whom questionnaires would be sent if absolute proportional representation were to be achieved, four are calculated to receive questionnaires through use as a source of the voter registration lists presently at hand. Representation of literate adult non-whites is calculated to vary from an *overrepresentation* by 26.4% in St. Charles Parish to an underrepresentation by 26% in Plaquemines Parish, and in Orleans Parish (which contains almost eighty-four percent of the literate adult non-white population of the seven parishes) the underrepresentation is calculated to be 14.5%.

13. The total of white persons registered to vote in the parishes of Plaquemines, St. Bernard and St. Tammany exceeds the total adult white population of each of those parishes. The apparent explanation for this seeming anomaly is that the registration lists have not been purged and persons who have died or moved are still carried on the rolls. Persons who have died or left this District are obviously not actually available as jurors, even though their names still appear on the registration lists. Since large-scale non-white registration is relatively recent in all seven parishes, it is likely that the great preponderance of the registrants who are unavailable as jurors are white. Thus, even discounting the preponderance of non-whites among those few registrants who are

disqualified for jury duty because of illiteracy, it is likely that the voter registration lists used herein constitute a source of available and qualified jurors in which the underrepresentation of non-whites is in fact somewhat less than the apparent 20.8%.

14. Between June, 1965 and July, 1967, the non-white proportion of the registered voters in the seven parishes as a whole, and in most of the parishes individually, increased steadily and significantly. The increase was most marked in Orleans Parish, where eighty percent of the non-white population of seven parishes reside. There is every reason to believe that this steady increase will continue.

15. Non-whites comprised 16.62% of the 4,759 persons who were sent questionnaires prior to the drawing of the grand jury which indicted defendant. Part of the explanation for this apparent underrepresentation of non-whites, in comparison to their proportion of registered voters, lies in the inadvertent failure to obtain and use, prior to that time, the registration list for St. John the Baptist Parish (where non-whites comprised 41.5% of the electorate) and the Federal Registrar's list for Plaquemines Parish (which accounted for all but ninety-six of the non-white electors in that parish). This inadvertence, however, had only a minor bearing on the result, since the non-white registered voters in St. John the Baptist Parish and the non-white Federally-listed electors in Plaquemines Parish comprised only slightly more than six percent of the total non-white electorate of the seven parishes. The more significant cause for the apparent underrepresentation was the fact that, at the time that the grand jury was drawn, only one selection had been made from Orleans Parish, which provides seventy-three percent of the non-white electorate of the seven parishes. Thus, the apparent underrepresentation was not in fact a real one, but merely reflected the fact that, where the compilation of the jury list is a continuous process, it is not always possible to draw grand and petit jury venires at a time when a complete selection has been made from the entire source. It can be calculated that, if the next grand and petit jury venires are drawn immediately upon the completion of the second selection from Orleans Parish, non-whites will comprise approximately twenty-three percent of those additional persons to whom questionnaires will have been sent after the drawing of the grand jury which indicted defendant.

16. Non-whites comprised 13.4% of those on the jury list (excluding those whose race cannot be ascertained) at the time of the drawing of the grand jury which indicted defendant. The explanation for this lower proportion of non-whites on the jury list than among those who received questionnaires lies in the high proportion of non-whites in comparison to whites who failed to return their questionnaires. A total of 37.6% of the non-whites who received questionnaires did not return them, as against only 19.71% of the whites. While non-whites comprised only 16.62% of those who received questionnaires, they comprised 27.59% of those who failed to return them.

17. Initially, the jury commissioner mailed follow-up letters to those who failed to return their questionnaires. She received only a limited response, however, and, as a result, discontinued the practice. Because the returns from this second solicitation have been so small, it is more feasible from the point of view of keeping the jury list of sufficient size to serve the needs of this Court for her to spend her time assisting the clerk in making initial selections from the registration lists, mailing questionnaires, and processing the returns.

II

CONCLUSIONS OF LAW

1. The selection of jurors for this Division was properly limited to the seven parishes which, in terms of time

and facility of transportation, are nearest to the situs of this Court. According to the provisions of 28 U.S.C. § 1865 (a), "Grand and petit jurors shall from time to time be selected from such parts of the district as the court directs so as to be most favorable to an impartial trial, *and not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service * * *"* (emphasis added). That section has repeatedly been held to be constitutional.

■ 2. Determination of the legality of the jury selection procedure used in this Division, as measured against the standards laid down by the Court of Appeals for this Circuit,[2] turns upon the adequacy of the source used to obtain the names of prospective jurors and not upon proportions on the jury list at any given time. Because compilation of the jury list is a continuing process in this Division, and grand and petit jury venires must be drawn when they are needed, proportions on the jury list at the precise moment when these drawings are made can rarely be expected to reflect accurately the proportions in the basic source. Moreover, the degree to which proportions on the jury list, even in the long run, reflect proportions in the basic source are affected by failures to return questionnaires and requests for excuses from jury service, matters over which those who compile the jury list have no control. It is the long run adequacy of the basic source that determines whether the necessary opportunity for jury service is offered to all qualified elements of the population.

■ 3. No showing has been made concerning the cross-sectional validity of the jury selection procedure in respect to other than racial elements of the population of this Division. Defendant did offer an analysis—in respect to age, education, occupation, and parish of residence—of the jury list at the time of the drawing of the grand jury which indicted him, but he offered no similar analysis of the basic source from which potential jurors were selected, i. e., the voter registration lists. Moreover, no showing was made that even the jury list at that time did not reflect an adequate cross-section of the seven parishes in respect to those categories. In any event, the same affirmative efforts to achieve a cross-section are not required in respect to other elements of the population as are required in respect to racial elements. It is sufficient that there be no deliberate efforts to exclude or limit to token representation any such other cognizable element of the population qualified for jury service and that the jury selection procedure not be calculated to achieve that effect despite the lack of a deliberate intent. No showing has been made that the jury selection procedure here is fallible in this regard.

■ 4. In determining whether the source for the selection of potential jurors used here was adequate to offer an opportunity for jury service to a fair cross-section of the population of the seven parishes in regard to racial elements, it is necessary both to measure the racial proportions of that part of the source which is actually available and qualified for jury service against the racial proportions of the qualified population of the seven parishes, and to consider what such proportions are likely to become as time goes on. Clearly, in compiling a jury list, it is only a fair cross-section of *qualified* persons which must be sought. Equally clear, in judging the validity of a selection procedure established for the long run, its probable long run results must be considered as well as its present results.

■ 5. The Court of Appeals for this Circuit made clear in *Rabinowitz* and in its companion cases that perfect proportional representation is neither required nor desired as a goal. This being so, a source for jury selection in which qualified non-whites are, on the

---

2. Rabinowitz v. United States, supra.

face of the list used as the source, under-represented by only 20.8%, and in which upon further analysis they are probably underrepresented by an even lesser percentage, is clearly an adequate source, particularly when it is considered that the trend is toward an increase in their representation as time goes on. Further support for this conclusion is offered by the fact that in some parishes qualified non-whites are actually overrepresented in the basic source. Moreover, even if proportions of all adult non-whites, and not merely qualified non-whites, are considered, the resultant present underrepresentation of 30.5% does not make the source inadequate. Seven out of a possible ten constitutes a "fair cross-section".

■ 6. The fact that under the procedure used here jury service is limited to registered (or Federally listed) voters does not invalidate the procedure. It is well established that the use of voter registration lists as the primary or sole source of names for jury duty does not constitute an unlawful exclusion of non-electors.[3] In Chance v. United States,[4] the Court of Appeals for this Circuit held that the use of such lists is unlawful only if they are used as a subterfuge to discriminate against cognizable elements of the population. Since in six of the seven parishes there is no impediment to registration by any citizen qualified to vote, and in the seventh use of the state list is supplemented by use of the Federal Registrar's list, the use here cannot be said to constitute such a subterfuge. Nor does the use of registration lists interpose an additional qualification to the qualifications set by 28 U.S.C. § 1861. Rather, random selection from registration lists assures that subjective standards will not be used in selecting jurors.

7. As noted in Swain v. State of Alabama,[5]

■ "* * * [A] defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn (citing authority). Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. 'Obviously the number of faces and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation.' "

8. This idea is reiterated in Chance v. United States, supra, wherein the Court, in rejecting the appellant's contention that the grand jury which indicted him was not empaneled according to law, observed:

"Appellant's main contention is that the grand jury list does not represent a cross-section of the community. At the most, the notion of a grand jury as a cross-section of the community is a conceptual one. *A literal cross-section is neither required nor desired.* Those persons who have been convicted of a crime and not pardoned, those not competent in the English language, and those mentally or physically infirm are disqualified

3. Gorin v. United States, 313 F.2d 641, 644 (CA 1–1963); United States v. Van Allen, 208 F.Supp. 331, 334, 335 (SDNY–1962). See also Hearings on Federal Jury Selection, Proposals to Improve Judicial Machinery For the Selection of Federal Juries, pp. 43, 44 where Attorney General Clark stated "Here is the problem. We looked at every type of list we could find. We looked at post office addresses, at Civil Service Commission lists, at social security lists, and we considered telephone books, and a city directory sort of list, and we couldn't find any

list that would be across the country nearly as good as the voter list. We put a quite high priority on certainty as to where the individuals should be chosen from, and we found some relationship between the public interest that would cause a person to register to vote, and jury service."

4. 322 F.2d 201 (CA 5–1963), certiorari denied, 379 U.S. 823, 85 S.Ct. 47, 13 L.Ed.2d 34.

5. 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1964).

under 28 U.S.C.A. § 1861. Many persons and classes are granted exemptions and exclusions under 28 U.S.C.A. §§ 1862, 1863. In many sections of this country, a Spanish-speaking community is predominant. An English-speaking jury is certainly not a 'cross-section' of such a community." (Emphasis added.)

It is at once apparent from these cases that the so-called literal "cross-section" is not the ultimate goal in jury selection. Not only do these cases recognize the virtual physical impossibility of obtaining such a cross-section but they demonstrate succinctly the undesirability of such a cross section in many instances.

█ In the parishes in this district all citizens meeting the Federal criteria for voter registration are now eligible to vote. The procedure selected therefore in no way inhibits those citizens who desire to serve as jurors from so serving by limiting the eligible jurors to registered voters. By the selection of names, at random from voter lists on which all persons of every race, religion, and economic station may alike register, it is manifestly impossible for discrimination to exist in the selection of white and non-white jurors or in any other matter of constitutional significance. This source discriminates against only one group: those who regardless of race do not take their duties as citizens seriously enough to register to vote. Such a discrimination is neither invidious nor unconstitutional.

In his special message to Congress on Civil Rights on February 16, 1967, the President, in recommending legislation to eliminate discrimination in the selection of juries in federal courts, and to insure that juries in federal courts are uniformly drawn from a broad cross-section of the community, stated:

"To reduce to a minimum the possibility of arbitrary exclusion of certain groups, the act will spell out in detail the selection procedures to be followed

in all Federal district courts. Names of prospective jurors would be obtained by random selection from voter lists—a broadly representative source in almost all parts of the country, now that the Voting Rights Act of 1965 is being implemented." [6]

█ 9. The jury selection procedure used herein meets all constitutional and statutory standards; the grand jury which indicted defendant was lawfully convened; and the indictment is, therefore valid.

---

**6.** 113 Congressional Record No. 1397 (H. DOC. No. 56), 1967 U.S. Code Congressional and Administrative News, pp. 195–205 at p. 202.