[Civ. No. 40086. Second Dist., Div. Three. Sept. 13, 1972.]

RICKEY RELAINE ADAMS, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Richard S. Buckley, Public Defender, James L. McCormick, Gerald L. Chaleff, Harold E. Shabo and G. Keith Wisot, Deputy Public Defenders, for Petitioner.

Edward I. Pollock, Ned Good, James G. Butler, Stanley K. Jacobs, Sanford M. Gage, Leonard Sacks, A. L. Wirin, Fred Okrand, Laurence R. Sperber, Mario Obledo, Miguel Garcia, Stephen Gilbert, Terry J. Hatter, Jr., John A. Childers, Abby Soven, Ernest L. Aubry, Harold C. Hart-Nibbrig, Kenneth C. Mason and Richard J. Palmer as Amici Curiae on behalf of Petitioner.

John D. Maharg, County Counsel, Donald K. Byrne and Harold S. Vites, Deputy County Counsel, for Respondent.

Joseph P. Busch, District Attorney, Harry Wood, Arnold T. Guminski, Ronald Ross and Harry B. Sondheim, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**FORD, P. J.**—This is a proceeding in mandamus to compel the superior court to vacate its order denying petitioner's motion to quash the petit jury panel,[1] by which motion he challenged the manner in which jurors are selected for the Central District of the court, and to make an order granting that motion.

The criminal case in which the motion was made is pending in the Central District, one of the nine districts of the Superior Court of Los Angeles County. By a consolidated information containing 17 counts, petitioner is accused of the commission of various felonies. The crimes with which he is charged occurred within the boundaries of the Central District, of which petitioner, a Negro, is a resident. Jurors selected for the Central District are drawn from the list of names of registered voters on a county-wide basis. For each of the other eight judicial districts the selection of jurors is made by resort to the list of registered voters living in the

---

[1] Section 1060 of the Penal Code is as follows: "A challenge to the jury panel must be taken before a juror is sworn, and must be in writing or be noted by the phonographic reporter, and must plainly and distinctly state the facts constituting the ground of challenge." (See *People* v. *Sirhan,* 7 Cal.3d 710, 749-752 [102 Cal.Rptr. 385, 497 P.2d 1121].)

particular district. No attack is made upon the formula by which the names of prospective jurors are obtained by means of a computer system. The core of petitioner's challenge is that because of the resort to a county-wide draw for the Central District, as contrasted with a district-wide draw for the other districts, he is subjected to a denial of due process and of equal protection of the law. The pertinent circumstances in the light of which the validity of that challenge must be determined will be set forth.

The place of trial of a person charged with the commission of a felony is normally the county in which the crime is alleged to have been committed.[2] Historically, the courthouse has been located at the county seat. While the county seat of Los Angeles County is the City of Los Angeles, the gradual and substantial increase in population[3] and the unusually large geographical area of the county have resulted in the establishment of branch courts as a means of maintaining efficient judicial administration. That growth has culminated in the establishment of eight judicial districts, supplementing that portion of the court system retained at the county seat and which is geographically within the area presently designated as the Central District. Thus, there are now nine geographical areas constituting specifically named districts.

The designation and functions of the various districts are set forth in the Rules of the Superior Court of Los Angeles County. With respect to criminal cases, pertinent sections of rule 2 will be noted. Section 1 contains the provision that sessions of the court shall be held in the designated nine districts. In section 2 it is stated that every indictment by the grand jury shall be filed in the Central District. Section 3 is concerned with the subject of optional filing and it is therein provided that a criminal action or proceeding, other than as specified in section 2, may be filed in the Central District and, further, that criminal actions may be filed in a district in which "one of the offenses was committed" or in which "the preliminary hearing was held." Section 5 relates to the transfer of a case in the event of a congested calendar and is as follows: "Whenever, in the opinion of the Presiding Judge, the calendar in any district including the

---

[2] Section 777 of the Penal Code states the basic rule of venue: ". . . except as otherwise provided by law the jurisdiction of every public offense is in any competent court within the jurisdictional territory of which it is committed." With respect to felonies, which are triable in the superior court, the "jurisdictional territory" is the county. (Pen. Code, § 691; *People* v. *Jones,* 228 Cal.App.2d 74, 86 [39 Cal.Rptr. 302].) Thus, the county in which the crime was committed is the proper venue except where some other statute provides an alternative venue. (See Witkin, Cal. Criminal Procedure (1963) § 68, p. 66.)

[3] The present population of the County of Los Angeles is approximately 7,000,000 people.

Central District, has become so congested as to jeopardize the right of a party to a speedy trial or to materially interfere with the proper handling of the judicial business in the district, he may order the transfer of one or more cases pending in that district to another district for trial or may order, for a limited period, that cases which may be filed in that district shall be filed in a different district." The subjects of section 6 are the convenience of witnesses and the promotion of justice, a portion relevant with respect to criminal cases being as follows: "After prior approval by the transferee judge and the judge presiding in the Criminal Master Calendar Department in the Central District, a criminal action may be transferred from one district to another."

Rule 3-A of the Rules of the Superior Court of Los Angeles County is as follows: "All departments in the central district designated by the Presiding Judge to hear criminal cases, and all departments in any other district designated by the Supervising Judge of that district to hear criminal cases, shall be designated as the Criminal Division of the Los Angeles Superior Court."

Turning to the relevant statutory provisions as to the selection of jurors in the County of Los Angeles, it is to be noted that section 206 of the Code of Civil Procedure as amended in 1923 (Stats. 1923, ch. 195, § 2, p. 437) was as follows: "The list of jurors, to be made in counties of the first class, shall contain the number of persons which shall have been designated by the court in its order. The names for such lists shall be selected from the different wards or townships of the respective counties in proportion to the number of inhabitants therein, as nearly as the same can be estimated by the persons making said lists; and said lists shall be kept separate and distinct one from the other; provided, further, that in counties of the first class, where sessions of the superior court are held in cities therein, other than the county seat, the names for such lists to serve in said city shall all be selected from the townships in which said city is located; and provided, further, that no names from said township shall be selected to serve as trial jurors for any other part of the county."

By amendment of section 206 in 1951 (Stats. 1951, ch. 1495, § 3, p. 3477) reference was made to judicial districts and districts instead of townships. In 1959 the section was reworded without substantive change (Stats. 1959, ch. 501, § 10, p. 2456). Section 206 was not thereafter amended until 1963 (Stats. 1963, ch. 1412, § 1, p. 2949) when the words "other than in the county seat" were added as the last words of the section. Accordingly, section 206 of the Code of Civil Procedure is presently as follows: "The list of trial jurors made in a county of the first class [Los

Angeles County] shall contain the number of persons which has been designated by the court in its order. The names for the trial jury list shall be selected from the different wards or judicial districts of the respective counties in proportion to the number of inhabitants therein, as nearly as the same can be estimated by the persons making the lists. The trial jury list shall be kept separate and distinct from the grand jury list. In a county of the first class [Los Angeles County], where sessions of the superior court are held in cities other than the county seat, the names for such list to serve in the city shall be selected from the district in which the city is located and no names from such district shall be selected to serve as trial jurors for any other part of the county, other than in the county seat."

At the hearing in this case of the defendant's challenge of the method of selecting jurors for the Central District, the Jury Commissioner of the Los Angeles County Superior Court testified that the jurors for the Central District are drawn from the entire county but that jurors for any other district are drawn solely from the geographical area of that district. There was a period of time of approximately a year and a half when, pursuant to the order of December 23, 1969, of the then presiding judge, the jurors for the Central District were drawn only from that district. That order was terminated by the order of July 6, 1971, signed by an acting presiding judge. When the witness first entered the county service in 1948, the jurors for the Central District were being drawn on a county-wide basis and that practice has continued except for the period of time during which the order of December 23, 1969, was effective. No inquiry is made by the jury commissioner as to the race of any prospective juror and his office keeps no statistics with respect to the matter of race.

The Assistant Jury Commissioner of the Los Angeles County Superior Court testified that he was the person primarily in charge of the maintenance of statistics with respect to the process of selection of jurors. A portion of his testimony was as follows: "Q. The Central District figures are lower, the percentage of people actually certified are lower than in any other district? A. Yes. The percentage of return, is less in the Central District. Q. What do you mean by return? A. The percent qualified as opposed to the number mailed out. Number of questionnaires mailed out." The witness' testimony and the statistics furnished by him supported the conclusion that the lesser proportion of residents of the Central District certified for jury duty was due to the factors of lack of response to letters sent to registered voters by means of the computer system and the number of responding persons who were excused from jury service. The witness had been with the office of the jury commissioner since 1968, and in the

period of his service the Central District has needed approximately 30 percent of the jurors summoned for the entire county because it is the largest district in terms of trial departments (including both civil and criminal trial departments).

The senior statistician for the Los Angeles County Clerk testified that in the year 1970 there were 782 juries sworn in criminal cases in the Central District, being slightly over 50 percent of all criminal juries sworn in the superior court in the entire county.

It was stipulated that a witness, Dr. Breiman, was a qualified statistician. Based on his study of documents which were in evidence, the witness testified that 22 percent of the registered voters in the county reside in the Central District. Eleven percent of the population of the county is black.

Dr. Breiman determined that if the jurors for the Central District were selected by means of a county-wide draw, 11 percent of the jurors so selected would be from the Central District. He explained that determination as follows: "The 69,000 names[4] . . . represent on the average one voter in every forty. Now, I assumed that the same number, that same ratio prevailed on the draw through the Central District as through other districts. So I had a figure which gave me the total number of registered voters that would be contacted in the Central District. Now, I then used Page 4-B [exhibit 4-b], which gave in the last column the per cent of certification in the Central District on the last available draw; namely, twelve per cent of all those names drawn in the Central District were certified. Now, using that twelve per cent figure, I simply took twelve per cent of the total number of voters of the 69,000 that would be contacted in the Central District, and arrived at a number certified in the Central District. Q. Did you do that for each and every district? A. I did that for each and every district. Q. In other words, you determined that of the 69,000, twenty-two per cent of them would be drawn from the Central District? A. That's right."

In short, based on the certification table for 1971, Dr. Breiman determined the proportion of the jurors selected for the Central District which

---

[4]It is necessary to understand the context in which the figure of "69,000 names" was used. The jury commissioner had previously testified that that figure of 69,000 referred to the number of names drawn by use of the computer system from the entire county-wide voter registration list as *prospective* jurors for the Central District. (Two regular draws were made for the Central District each year.)

A letter was sent to each prospective juror whose name was drawn, but the number of jurors actually certified for jury service in the Central District was only a fraction of 69,000, due to the substantial number of non-responses, excusals and exemptions from jury service.

would come from each judicial district. As has been noted, 11 percent would come from the Central District. By use of a document entitled "Racial Breakdown of Population of Los Angeles County" (exhibit 11), which had been prepared by a deputy public defender, and proceeding on the basis that 31.5 percent of the population of the Central District was black and 18.3 percent thereof was brown or Mexican-American, the witness estimated that of the 11 percent of Central District jurors, 3 percent would be black residents of that district and 2 percent would be brown residents thereof. In addition, 5 percent of the jurors would be black persons and 5 percent would be brown persons who were residents of other districts. Thus, a jury drawn on a county-wide basis for the Central District would consist of black persons to the extent of 8 percent and of brown persons to the extent of 7 percent. Of the "white and others," 6 percent would come from the Central District and 79 percent would be residents of other districts.

On cross-examination Dr. Breiman testified that 11 percent of the population of the county was black, a figure which represented the approximate total of the black persons in the various districts as shown on exhibit 11. The witness further testified that he had not tried to determine what percentage of the jurors selected would be black if drawn only from residents of the Central District but that his "very good estimate" was 31.5 percent.

In response to an inquiry on cross-examination as to how he reached the conclusion that on a county-wide draw 3 percent of the jurors would be black persons from the Central District, Dr. Breiman testified: "It is essentially very simple. The standard statistics procedure itself is to take the proportion of blacks to the population of the Central District, and assume that the proportion of the total number of jurors certified in that Central District will be for blacks the same as the proportion of the total population."[5] The witness' ensuing testimony was in part as follows: "Q. You also testified, as I recall that blacks in the Central District were certified at a lower rate than were other groups. A. Not blacks; the entire Central District was certified at a considerably lower rate than other districts. Q. Did you find out why that was? A. No. Q. Did you ask? A. I asked. I can't say the information is—I can't give the information as firsthand knowledge of the situation. I was told that there were a greater

[5]A part of the stipulation read into the record in the early part of the hearing was: "That it be deemed that Dr. Andrea Tyree be called, duly sworn and testified that in her opinion, and she being an expert in the field, voter registration figures be deemed to be consistent with the demographic composition of the population at large as reflected in the 1970 United States census."

number of non-responses in the Central District. Q. Did you run a statistical analysis as to whether more were black or more were white? A. That information is, to the best of my knowledge, not available. . . . Q. Did you work out the percentage of the population that lived in the Central Judicial District? A. No. I worked the percentage of the voter registration that was in the Central District. Q. That was how much? A. That was 22 per cent."

At the threshold of the discussion of the governing law and its application to the facts of the present case, it is appropriate to note the petitioner's position as expressed in the stipulation which, as has been noted, was read into the record early in the hearing: ". . . that the defendant desires a fair and impartial jury representing a cross-section of the community including a proportional representation of residents of the Central Judicial District; that defendant particularly desires that there be no systematic exclusion of Central District residents by under representation or any other means from the jury panel; that is, no systematic exclusion of those jurors who are familiar with the locale of these crimes and with the vicinity in which the charged crimes occurred and with the customs, traditions and morals, the patterns of thought, of action of speech and dress, common to the Central District; that defendant feels a knowledge of these aforementioned facts by the jurors is essential to a fair determination of his case."[6]

 The first argument presented by the petitioner is that section 206 of the Code of Civil Procedure, "as implemented by judicial order of July 6, 1971," is an arbitrary exercise of power denying both equal protection of the law and due process in violation of the Fourteenth Amendment. With respect to the matter of equal protection, the contention is that, as applied to the Central District, section 206 creates a substantial disparity between the percentage of Negroes "in the affected area" and the percentage of Negroes in the jury venire. At a later point petitioner brings his position into closer focus by stating: "It is also essential to understand that petitioner *does not ask* for any particular proportional representation of population on the venire. *He does ask* that there be neither systematic exclusion nor under-representation of identifiable classes in the selection of the venire."

[6]In his petition the defendant sets forth the charges contained in the consolidated information embodying 17 counts as follows: "[C]onspiracy to kidnap for purposes of robbery, extortion and murder (§ 182 Penal Code), kidnapping with bodily harm alleged (§ 209 Penal Code), assault with intent to commit murder (§ 217 Penal Code), suppression of a witness (§ 136b Penal Code), and multiple counts of armed robbery (§ 211 Penal Code)."

■ The governing constitutional principle is that jury selection systems must draw jurors from a fair cross-section of the community. (*United States* v. *Butera* (1st Cir. 1970) 420 F.2d 564, 567, citing, in footnote 3, pertinent decisions of the United States Supreme Court.)[7] "While the cross-sectional concept is firmly imbedded in the law, the constitution does not require that the jury or jury venire be a statistical mirror of the community." (*United States* v. *DiTommaso* (4th Cir. 1968) 405 F.2d 385, 389, cert. den. 394 U.S. 934 [22 L.Ed.2d 465, 89 S.Ct. 1209].)

The importance of adherence to the cross-sectional concept has been recently expressed by the Supreme Court of the United States in *Peters* v. *Kiff,* 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163]. Therein it was stated (407 U.S. at pp. 503-504 [33 L.Ed.2d at p. 94, 92 S.Ct. at p. 2169]): "When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that their exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented."

An eminent federal judge has recently stated: "The ideal is to select a jury that represents a cross-section of the community from which it is drawn. Although no group should have a veto power over convictions, each should have the right to participate in the process of determining guilt or innocence. If the jury is to remain a revered institution, it must be perceived truly as a jury of one's peers." (Irving R. Kaufman, *Harbingers of Jury Reform* (1972) 58 A.B.A.J. 695, 696.)

If all jurors selected for service in criminal cases in all judicial districts in Los Angeles were drawn at random on a county-wide basis, there would be no violation of the cross-sectional concept. (Cf. *People* v. *Fort* (Ill.App. 1971) 273 N.E.2d 439, 446.) ■ Indeed, as long as the system of jury selection is in compliance with the cross-sectional principle, it is constitutionally permissible to enact provisions, aimed at minimizing inconvenience to jurors and expense to the county, which limit the geographical area from which jurors are chosen for service in a particular judicial district. (See *United States* v. *Florence* (4th Cir.

---

[7] In *Butera* the court stated (420 F.2d at p. 572): "It should be remembered at the outset that, while a true cross section is the ultimate ideal, it is by no means the Constitutional mandate. What is required is a jury selection system free of discrimination against properly cognizable groups."

1972) 456 F.2d 46, 50; *Katz* v. *United States* (1st Cir. 1963) 321 F.2d 7, 9, cert. den. 375 U.S. 903 [11 L.Ed.2d 144, 84 S.Ct. 193]; *United States* v. *Brown* (E.D.La. 1968) 281 F.Supp. 31, 33.)

 As has been noted, Dr. Breiman testified that while 11 percent of the population of the County of Los Angeles was black, the information furnished to him showed that the selection of jurors on a county-wide basis resulted in 8 percent of the jurors being persons who were black. But that fact would not, in and of itself, establish unconstitutional under-representation. In *Swain* v. *Alabama,* 380 U.S. 202, at page 208 [13 L.Ed.2d 759, at page 766, 85 S.Ct. 824], the Supreme Court stated: "Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." Some disparity between the proportion of black persons in the total population and the proportion in the jurors selected is not necessarily indicative of discrimination, intentional or unintentional. It was stated in *United States* v. *Butera* (1st Cir. 1970) *supra,* 420 F.2d 564, at page 570, footnote 13: "We do admit that we will be content with a somewhat greater disparity when general population figures are used, simply because they do not clearly reflect the proper measure for a fair cross section: the number of persons actually eligible for jury service under valid statutory qualifications." As has been noted, in the area designated as the Central District, which contains approximately 62 percent of the black population of the county, the percentage of persons certified for jury service was less than in other districts because of the greater proportion of non-responses to the jury commissioner's letter and of persons excused from jury service. But the jury commissioner kept no racial statistics as to such matters and, consequently, there is no evidence as to whether such non-responses and applications to be excused were constant as to all segments of the population of the Central District or were greater or less in the case of black persons. The testimony of the jury commissioner and of the assistant jury commissioner did show, however, that the names of prospective jurors were selected at random by use of a computer system which gave assurance that there was no discrimination as to race or with respect to any other matter relating to the assembly of a body of prospective jurors constituting a fair cross-section of the population of the county. Furthermore, the record contains no suggestion that the jury commissioner applied improper standards in excusing persons from jury service.

In *United States* v. *DiTommaso, supra,* the court stated (405 F.2d at p. 390): "Under the authorities we have cited, we reject defendants' apparent argument that approximately proportional representation of the various identifiable groups in the community is required. If it can be ob-

tained by random selection, proportional representation may be the ideal —because it is the ultimate opposite to intentional exclusion—but it can be achieved only rarely, and then only in regard to some but not all, of relevant criteria. Substantial representation is all that is required."[8] In the case presently before this court no substantial disparity was shown between the proportion of Negro residents in the county as a whole and the proportion of Negroes on the panel of jurors. (Cf. *Turner* v. *Fouche* (1970) 396 U.S. 346, 359-360 [24 L.Ed.2d 567, 578-579, 90 S.Ct. 532].) Eight percent of the jurors selected by means of a county-wide draw were black persons. The proportion of black residents in the county was 11 percent. Thus, the representation of black persons was of the substantial nature required under the cross-sectional concept and satisfied the constitutional mandate. Consequently, the county-wide jury selection process could not be successfully challenged if it constituted the sole source of jurors for criminal jury trials conducted throughout the county.

The question remaining for resolution is whether the use of such jurors selected on a county-wide basis continues to be constitutionally valid where such use is restricted to the Central District and jurors for each of the other districts of the superior court are drawn only from residents of the particular district in which the trial is had. In short, the issue is whether that difference in jury-panel composition as sanctioned by section 206 of the Code of Civil Procedure and as honored in actual practice, except for the brief period of time hereinabove noted, constitutes an unconstitutional classification. As will be explained, the answer depends upon whether the nature of the functions of the superior court in the Central District relating to criminal cases differs so substantially from the nature of the functions of the court in the other districts with respect to criminal cases as to afford a constitutional basis for the variation set forth in section 206 as to the geographical area to which resort shall be had in the jury selection process. As succinctly stated in *Turner* v. *Fouche* (1970) *supra*, 396 U.S. 346, at page 362 [24 L.Ed.2d 567 at page 580], the traditional test as to whether there is a denial of equal protection under state law is "whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective."

Historically, the center of administration of the Superior Court of Los

---

[8]In a subsequent portion of the opinion in *DiTommaso* it was stated (405 F.2d at p. 392): "Measured by occupation, blue collar workers constituted 29.3% of the eligible population, but only 18.6% of the jurors drawn. We conclude that the constitution and the statute have been satisfied in this regard. The representation of blue collar workers was substantial. The same is true when the composition of the jury is considered by the degree of education. Neither the constitution nor the statute requires more."

Angeles County has been at the county seat. As the growth of the population led to the creation of branches of the court, the center of administration remained unchanged and is in the geographical area which is presently designated as the Central District. Sessions of the grand jury are held at the county seat and, accordingly, it is appropriate that indictments be filed in the Central District. The efficient administration of justice requires that there be authority to transfer cases from one district to another for the purpose of assuring that no defendant is deprived of his constitutional right to a speedy trial and so that problems of court congestion can be avoided or solved. As has been noted, the necessity for that authority is recognized in the Rules of the Superior Court of Los Angeles County. While efficiency in governmental administration places a reasonable limitation on the physical facilities and judicial manpower available in the branch courts or judicial districts, the more commodious and adaptable physical facilities and the large reservoir of judges maintained at the county seat in the Central District afford the flexibility essential to the proper administration of criminal justice. The presence in the Central District of a body of jurors selected on a county-wide basis in accordance with the cross-sectional principle assures a defendant whose case is transferred to that district of a jury free from constitutional defects, irrespective of the place in the county at which the crime is claimed to have been committed or of the defendant's place of residence.

It is true that it was stipulated that Judge Keene (who was qualified because of his judicial experience) would testify that as to each of the years 1970 and 1971, it was his estimate that approximately 20 to 25 cases were transferred from branch courts to the Central District. While that number of cases is not large, the fact of such transfers is significant in that it supports the conclusion that a necessity exists for the availability of a constitutionally sound means of transfer of criminal cases. Moreover, it is a matter of common knowledge that in a substantial number of criminal cases in Los Angeles County the trial by jury extends over periods of weeks or months. It is manifest that trials of long duration held in a branch court may cause disruption in the disposition of other cases awaiting trial in that district. Efficient judicial administration requires that a case necessitating a lengthy trial be subject to transfer to the Central District where more ample physical facilities exist, greater judicial manpower is available, and a larger pool of jurors is present. Furthermore, as has been noted, of all the criminal juries sworn in the county, approximately 50 percent are in the Central District,[9] although

---

[9] The statistics submitted to the Judicial Council of the State of California for the year 1970 by the County Clerk of Los Angeles showed that of the total of 1,497

that district contains 22 percent of the population. That fact fortifies the conclusion that the jurors for the Central District may properly and reasonably be drawn on a county-wide basis because, in addition to the matter of compliance with constitutional principles, consideration of the burden placed on persons called for jury service is a factor not to be overlooked. This factor was recognized in the federal legislation relating to selection of jurors, as was noted in *United States* v. *DiTommaso* (1968) *supra,* 405 F.2d 385, at page 391, as follows: "In selecting jurors from throughout a district, a district court is enjoined to make its selection from the parts of the district 'so as to be most favorable to an impartial trial, and *not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service.*' 28 U.S.C.A. § 1865 (emphasis added)."

In view of the permissible state objectives attained by the selection of jurors on a county-wide basis for the Central District and on a district-wide basis for each of the other districts of the Superior Court of Los Angeles County, under the traditional equal protection criterion the classification embodied in section 206 of the Code of Civil Procedure is constitutional because it is not palpably arbitrary but is based upon sound reasons cognizable by the Legislature. (See *Whittaker* v. *Superior Court,* 68 Cal.2d 357, 370 [66 Cal.Rptr. 710, 438 P.2d 358].) But since the classification relates to the fundamental right to a trial by jurors drawn from a fair cross-section of the community, its constitutionality must be judged by the stricter standard of whether it is *necessary* to promote a *compelling* state interest. (*Shapiro* v. *Thompson,* 394 U.S. 618, 638 [22 L.Ed.2d 600, 617, 89 S.Ct. 1322]; *Purdy & Fitzpatrick* v. *State of California,* 71 Cal.2d 566, 578-579 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].) It is to be noted that in the present case the petitioner raises no question as to the propriety of the method of selection of jurors in any district other than the Central District.

An essential concern of the state is that there be a system for the administration of justice in criminal cases which assures a meaningful adherence to constitutional principles. The population and geographical area of Los Angeles County necessitate a system of a complex and flexible nature. Only by use of branch courts in designated districts can the superior court function in such a manner as to reasonably accommodate litigants, jurors, witnesses and other interested persons. However, the requisite efficient operation of such a judicial system requires the maintenance of a forum for the trial of cases which cannot be readily heard in the branch courts

---

juries sworn in criminal cases in the superior court for the year 1970, 782 were in the Central District. In the year 1971, 1,300 juries were sworn in criminal cases in the county, 579 thereof being in the Central District.

sitting in cities other than the county seat. Under the present system that forum is in the Central District. In view of the county-wide scope of a substantial portion of the actual and potential duties of the court sitting in the Central District in the trial by jury of criminal cases, the selection of jurors for the Central District on a county-wide basis is necessary to promote a compelling state interest in that thereby a constitutionally valid cross-section of the population of the county, as distinguished from a particular district, is unquestionably obtained. Consequently, the stricter equal protection standard is satisfied by the classification for which provision is made in section 206 of the Code of Civil Procedure.

The alternative writ of mandate is discharged. A peremptory writ of mandate is denied.

Allport, J., concurred.

**COBEY, J.**—I dissent. I would grant the writ.

The question presented is whether the current dual system of selection of prospective trial jurors in criminal cases in the Superior Court of Los Angeles County is unconstitutional under the equal protection clause of the Fourteenth Amendment to the United States Constitution and under article I, sections 11 and 21 of the California Constitution. I have been unable to find any definitive authority on the point but I believe that the dual system is unconstitutional because it results in the systematic exclusion of residents of the Central District from the possibility of service as trial jurors without a compelling governmental interest and necessity to justify such discrimination.

The Superior Court of Los Angeles County has nine districts. In all the districts except the Central District the selection of prospective trial jurors in criminal cases is made at random from registered voters living in the particular district. In the Central District, however, such selection is made at random from registered voters residing throughout the county. In short, for Central District criminal cases there is a county-wide draw of prospective jurors; in all other districts prospective jurors are drawn only from residents of the particular district.

I concede that the use of either system of prospective juror selection is constitutionally permissible if either were the *only* system used in criminal cases in the Superior Court of Los Angeles County. (See *People* v. *Jones* (1972) *(Cal.App.) 103 Cal.Rptr. 475.) The rub lies in the use of both systems at the same time.

---

*A hearing was granted on October 18, 1972.

The makeup of the Central District is quite different from that of Los Angeles County as a whole. The Central District contains approximately 22 percent of the county's population. The population of the Central District is, however, 31.5 percent black and 18.3 percent brown (Mexican-American). The population of the county, on the other hand, is 11 percent black and approximately 10 percent brown. Indeed, approximately 62 percent of the entire black population of the county resides in the Central District.

The Central District is apparently, for the most part, a ghetto of low income working-class families. The people within it have little mobility and live, work and exist almost completely within the district. Their way of life is largely unique when it is compared to the ways of life obtaining in the other districts. This uniqueness extends to life style, environment, problems, perception of life and even, to some extent, to language.

The superior court's basic reason for returning to the dual system of prospective juror selection was because the most complicated and lengthy civil litigation involving the most money tends to be tried in the Central District because of the location within this district of the large downtown law firms and presumably of their principal local business clients. Apparently the impact of the change in the system of prospective juror selection upon the composition of juries in criminal cases was not even considered prior to the change.

In my opinion the dual system constitutes a systematic means of excluding residents of the Central District from jury service in the trial of criminal cases in the Superior Court of Los Angeles County. Instead of these residents being the *sole* source of such prospective jurors for cases tried in the Central District as the residents of other districts are for cases tried in their district, they constitute but 22 percent of such jurors. Their position as the source of such prospective jurors has been reduced therefore from 100 percent to 22 percent — a reduction of 78 percent.[1] Furthermore,

---

[1]In fact, because of the lack of response and the higher percentage of persons excused from jury service in the Central District, only 11 percent of the prospective jurors drawn countywide are actually residents of the Central District. Of this 11 percent, 3 percent are black and 2 percent are brown.

My position is that the equal protection clause and its California counterparts (see *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597, 609, 596, fn. 11 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]) prohibit such a gross exclusion of an identifiable geographical group, regardless of the subjective nondiscriminatory intent of those adopting the dual system of prospective juror selection. (See *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 220 [90 L.Ed. 1181, 1185, 66 S.Ct. 984, 166 A.L.R. 1412, 1415]; *Apodaca* v. *Oregon* (1972) 406 U.S. 404 [32 L.Ed.2d 184, 193, 92 S.Ct. 1628] (Ct. opn. for four members of the court); *Carmical* v. *Craven* (9th Cir. 1972) 457 F.2d 582, 587-588 (cert. applied for June 19, 1972).) Such discrimination,

residents of other districts may be jurors in criminal cases tried in the Central District; residents of the Central District may never become jurors in criminal cases tried in other districts.

Modifying slightly the language of Mr. Justice Marshall in his court opinion for three members of the court in the very recent case of *Peters* v. *Kiff* (1972) 407 U.S. 493, 503-504 [33 L.Ed.2d 83, 94, 92 S.Ct. 2163], quoted by the majority, *supra*, "[When the opportunity of any large and identifiable segment of the community to be prospective trial jurors in criminal cases is drastically reduced], the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that their exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented."

Turning from the effect of the dual system upon the opportunity of residents of the Central District to serve as trial jurors to its effect upon the constitutional right of defendants in criminal cases tried in the Central District, such as Rickey Adams, I have this to say. Since the decision of the United States Supreme Court in *Duncan* v. *Louisiana*, 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444], on May 20, 1968, the grant in state courts of jury trials for serious offenses (such as those involved in this case), is a *fundamental* constitutional right "essential for preventing miscarriages of justice and for assuring that fair trials are provided for all defendants."[2] (*Duncan* v. *Louisiana, supra,* at pp. 157-158 [20 L.Ed.2d at p. 501].)

It seems clear to me that Rickey Adams' constitutional right to a jury trial is directly affected by the dual system of selecting prospective trial jurors in criminal cases in the Los Angeles County Superior Court. Since he is to be tried in the Central District his prospective jurors will be drawn countywide, but one tried for precisely the same crimes in another district would be tried by a jury drawn exclusively from residents of that particular district. The constitutional right of a defendant in a criminal case to trial by jury includes trial by a proper jury. (See *Glasser* v. *United States* (1942) 315 U.S. 60, 85 [86 L.Ed. 680, 707, 62 S.Ct. 457].) Similarly situated

whether practiced ingeniously or ingenuously, is constitutionally proscribed. (See *Smith* v. *Texas* (1940) 311 U.S. 128, 132 [85 L.Ed. 84, 87, 61 S.Ct. 164].)

[2]*Duncan* does not apply to cases tried in state courts where the trials began prior to May 20, 1968. (*DeStefano* v. *Woods* (1968) 392 U.S. 631, 635 [20 L.Ed.2d 1308, 1312, 88 S.Ct. 2093].)

defendants in criminal cases in Los Angeles County are constitutionally entitled to be tried by juries selected on the same basis. Otherwise the concept of constitutional equal protection of the laws that "persons similarly situated with respect to the legitimate purpose of the law receive like treatment" (see *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]) is violated.

Accordingly, since both a fundamental constitutional right of defendants in criminal cases is involved and there is likewise some indication of suspect classifications (wealth and race), the dual selection system before us is constitutional only if it can be justified in terms of both necessity and a compelling governmental interest. (See *Purdy & Fitzpatrick* v. *State of California, supra,* at p. 579; *In re Antazo* (1970) 3 Cal.3d 100, 110-111 [89 Cal.Rptr. 255, 473 P.2d 999].) The majority have been unable to meet this burden. They do not show necessity. They refer to only two types of cases in which the criminal case load in the Central District differs from those of the other districts. First, as a matter of convenience for the district attorney, all indictments are filed in the Central District and all criminal cases starting with an indictment are therefore tried in the Central District. These cases, however, comprise only a negligible portion of the total number of criminal cases tried by juries in the Central District (69 in 1970, 79 in 1971).

The second justification offered is that since the Central District has by far the largest number of judges, courtrooms and related personnel and facilities generally, it is the district to which large, difficult and lengthy cases originating in the other districts are transferred for trial. This is true, but again these transferred cases run about 20 to 25 a year out of the roughly 700 criminal cases tried by jury per year in the Central District. Furthermore, as the public defender has suggested, a countywide draw limited to these two types of cases and to civil cases as well would appear to be both constitutionally permissible and feasible. I note that the case before us falls into neither of these two categories.

This leaves as the only justification advanced by the majority for the dual system the fact that the burden of jury service upon the residents of the Central District is thereby substantially reduced. Since roughly one-half of the criminal cases tried to a jury are tried in the Central District, containing a little over one-fifth of the county's population, this burden is disproportionate and not inconsequential. But service on trial juries is one of the fundamental obligations of citizenship and although alleviation of this burden upon residents of a certain geographical area may be a laudable object, considered by itself, it cannot reasonably be said to rise

to the stature of a necessarily *compelling* governmental interest. Furthermore, as previously mentioned, an effect of the dual system of jury selection is to deny to residents of the Central District alone the right to serve on juries elsewhere than in the Central District.

I do not believe that *Whittaker* v. *Superior Court* (1968) 68 Cal.2d 357 [66 Cal.Rptr. 710, 438 P.2d 358], compels a contrary conclusion. There the question before our Supreme Court was whether it is constitutionally permissible to have in this state two differently sized courts to hear appeals from justice court misdemeanor convictions when the differentiation in size depends upon whether the particular county has a municipal court. (*Whittaker* v. *Superior Court, supra,* at pp. 366, 368.) A fundamental right of defendants in criminal cases was not involved and, as pointed out in *Whittaker* at page 369, under our constitutional system judges, unlike trial juries, are not supposed to be representative.

I would grant the writ.

A petition for a rehearing was denied October 10, 1972, and the opinion was modified on October 10 and 11, 1972, to read as printed above. Cobey, J., was of the opinion that the petition should be granted. Petitioner's application for a hearing by the Supreme Court was denied November 9, 1972. Peters, J., and Mosk, J., were of the opinion that the application should be granted.