[No. B028038. Second Dist., Div. Seven. Nov. 9, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
DARYL TORIE HARMON, Defendant and Appellant.

**COUNSEL**

Richard J. Burton, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Arnold Overoye, Acting Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Marc E. Turchin and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WOODS (Fred), J.**—A jury convicted appellant of robbery and appellant then admitted an alleged prior felony conviction of forcible rape. The court sentenced him to state prison for ten years, the five-year upper term for robbery and five years, consecutive, for his prior felony rape conviction (Pen. Code, § 667, subd. (a).)[1]

Appellant contends he was denied a representative cross-section jury venire, denied effective assistance of counsel at an in-court "lineup," and denied equal protection by the court's trial transcript orders.

We find appellant's contentions without merit and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*The Crime*

On February 3, 1986, at 9:00 a.m. Bonnie DeJong was unlocking the door of her crisis pregnancy center when a man approached and said "Hey, how you doing?" She looked up and saw a dark-complected Black man. The man grabbed the purse hanging from her shoulder but could not free it from her briefcase. He punched Ms. DeJong on her left cheek and still could not get the purse free. He then pushed her into a wall, she lost her balance, the purse got loose, and she screamed.

---

[1] Unless otherwise noted all statutory references are to the Penal Code.

Richard Denham, who worked in the same building as Ms. DeJong, heard the scream, went to the door, saw her being attacked, and ran after her attacker.

Pursued by both Mr. Denham and Ms. DeJong, the Black man jumped into a blue Toyota station wagon, pulled away from the curb, and began making a U-turn when an oncoming car slammed on its brakes. The blue Toyota momentarily stopped, then sped off.

Both Ms. DeJong and Mr. Denham noted the complete license number of the blue Toyota.

Within minutes the sheriff's department was notified and responded. Ms. DeJong told the deputy sheriff that her attacker was a male Black, five feet nine inches or five feet seven inches, one hundred and seventy pounds, wearing a blue watch cap, red plaid shirt, and dark pants. She described his complexion as very dark and did not notice any facial hair. She provided the complete license number of the blue Toyota.

About 45 minutes later sheriff's Detective Scott was informed of the robbery, ran a Department of Motor Vehicles (DMV) check on the license number and learned it was registered to Alice or Joyce Harmon, 611 N. Northwood Ave., Compton.

By 10:30 a.m. that same morning Detective Scott and his partner, after informing the Compton Police Department of their intent to do so, staked out the 611 N. Northwood Ave. residence. At about 11:30 a.m. they saw the described blue Toyota, license number exactly matching, approach and pull into the driveway of that residence. Detective Scott immediately pulled his unmarked police vehicle into the driveway behind the Toyota and, at this same time, a marked Compton Police Department patrol car arrived.

Both Detective Scott and the driver of the Toyota, appellant, a male Black, about five feet six inches, stocky-muscular, wearing dark pants and a white shirt with red stripes, got out of their cars.

Detective Scott identified himself to appellant and ordered him to stop.[2] Appellant ran and Detective Scott tackled him on the front porch. After a protracted struggle, which continued inside the residence, appellant freed himself, dove through the closed bedroom window, and fled. A two and one-half hour search for appellant, with a helicopter and canine unit, was unavailing.

---

[2] These events were disputed by defense witnesses. Since appellant does not challenge the sufficiency of the evidence we merely summarize it from a perspective favoring the judgment, in accord with the usual rule on appeal. (*People* v. *Woodberry* (1970) 10 Cal.App.3d 695, 699 [89 Cal.Rptr. 330].)

About a month and a half later Detective Scott arrested appellant.

*The Charges*

Appellant was charged with robbery (§ 211), felony battery (§§ 242/243), and felony resisting arrest (§ 69). It was alleged, as to each count, that at the time of the commission of each offense appellant had been released from custody on bail (§ 12022.1). By amended information appellant was charged with having suffered a prior forcible rape conviction (§ 261, subds. (2), (3)).

*The First Trial*

On November 6, 1986, the prosecutor dismissed counts 2 (§§ 242/243) and 3 (§ 69), made an opening statement, called two witnesses and rested. On November 17, 1986, the jury being unable to agree upon a verdict, a mistrial was declared.

*The Instant Trial* [3]

The issues revolved around identity, alibi, flight, consciousness of guilt, and a "Jeffery must have done it" defense.

Ms. DeJong, the victim, and Mr. Denham identified appellant as the robber. Detective Scott testified the robbery car was registered to appellant's wife and mother, and two and one-half hours after the robbery appellant drove home in it, he resisted arrest, and fled. Other prosecution witnesses described appellant's refusal to participate in a lineup.

Defense witnesses testified that appellant habitually wore a moustache and beard and did so on the day of the robbery (Ms. DeJong and Mr. Denham noticed no facial hair on the robber). Appellant's mother testified that on February 3, 1986, she loaned the blue Toyota to appellant's good friend Jeffery Richardson who left with it at 8:30 a.m. and returned it at about 10:25 a.m.

Ms. DeJong and Mr. Denham were shown a photograph of Jeffery and testified he was *not* the robber. Jeffery Richardson's mother and sister testified they did not know appellant or his family.

---

[3] Although the record does not contain a transcript of the first trial it does reveal the sharp contrast between the two trials including a different prosecutor, different exhibits, different jury instructions, two defense witnesses who testified at the first but not at the second trial, eleven witnesses who did not testify at the first but did testify at the second trial, and a substantially longer second trial. Of course, the juries were different.

There was much peripheral testimony. Jeffery Richardson could not be located and did not testify. Appellant did not testify.

The jury found appellant guilty of robbery and thereafter appellant admitted the alleged prior rape conviction.[4]

## CONTENTIONS

Appellant contends:

1. He was denied a representative cross-section jury venire.

2. He was denied effective assistance of counsel at an in-court "line-up."

3. He was denied equal protection by the court's trial transcript orders.

## DISCUSSION

1. *He was denied a representative cross-section jury venire.*

■ There is no disagreement concerning general principles.

A criminal defendant has a constitutional right (U.S. Const., 6th Amend; Cal. Const., art. I, § 16) to a jury drawn from a representative cross-section of the community. (*Duren* v. *Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664]; *People* v. *Morales* (1989) 48 Cal.3d 527, 541 [257 Cal.Rptr. 64, 770 P.2d 244]; *People* v. *Harris* (1984) 36 Cal.3d 36, 48 [201 Cal.Rptr. 782, 679 P.2d 433].)

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren* v. *Missouri, supra,* 439 U.S. 357, 364 [58 L.Ed.2d 579, 586-587].) If a defendant meets his burden of proof and establishes a prima facie violation, the burden then shifts to the People to explain or justify the selection process. (*People* v. *Harris, supra,* 36 Cal.3d 36, 59; *People* v. *Morales, supra,* 48 Cal.3d 527, 543.)

There is disagreement, however, over the application of these general principles. ■ ■ ■ ■ The cases differ over the kind and quality of

---

[4]The record fails to disclose the disposition of the section 12022.1 enhancement.

evidence a defendant must adduce in order to satisfy his burden of proof with respect to the second and third requirements.[5]

Illustrative of one group of decisions are *People* v. *Buford* (1982) 132 Cal.App.3d 288 [182 Cal.Rptr. 904] and *People* v. *Harris, supra,* 36 Cal.3d 36.

In *People* v. *Buford* the defendant claimed a systematic exclusion of Blacks from his Contra Costa County jury venire. His proof was statistical: on one trial date 342 jurors appeared for duty, a panel of 70 were sent to his trial court, and there were no Blacks (*People* v. *Buford, supra,* 132 Cal.App.3d 288, 290); on another trial date, of a 53-member panel there was 1 Black juror (*ibid.*); at another trial during the same period, of a 63-member panel there were no Black jurors (*id.* at p. 291); and for an earlier trial 468 jurors were summoned, 266 appeared of whom 6 to 10 were Black. (*Ibid.*) The jury commissioner testified that this latter proportion was average for county jury pools. (*Ibid.*)

There was evidence that the Black population of Contra Costa County was approximately 7.8 percent and the Black eligible adult population about 7.3 percent. (132 Cal.App.3d at p. 291.)

The jury commissioner described the juror selection process this way: "[T]he master jury panel list is prepared annually using voter registration lists and Department of Motor Vehicles (DMV) computer tapes containing the names of all licensed drivers and persons with DMV identification cards. The DMV tapes and voter registration lists are merged, and then purged of duplications. The master jury panel list is drawn at random, by computer, from this merged list. Each week from 200 to 450 persons, selected randomly by computer from the master list, are summoned to appear for jury duty in the superior court. While the affidavit forms are sent to prospective jurors during the qualifying process, neither they nor the computer-stored data contain any indication of the prospective juror's race or ethnic origin." (132 Cal.App.3d at p. 291.)

On this evidence *Buford* held that the defendant had established a prima facie violation of the fair cross-section requirement. (132 Cal.App.3d at p. 299.)

---

[5]Respondent concedes that appellant satisfied the first requirement, viz., that Blacks are a "distinctive," legally cognizable group in the "community." The question of what constitutes the appropriate "community" for cross-section analysis, unresolved at the time of trial and appellate briefing, has recently been answered by our Supreme Court. *Williams* v. *Superior Court* (1989) 49 Cal.3d 736 [263 Cal.Rptr. 503, 781 P.2d 537] holds it is not the county or a 20-mile courthouse radius test but the *judicial district* which constitutes the "community."

However, for purposes of vicinage, a right discrete from that to a representative jury, the county is the appropriate geographic measure. (*Hernandez* v. *Municipal Court* (1989) 49 Cal.3d 713 [263 Cal.Rptr. 513, 781 P.2d 547].)

*People* v. *Harris* is similar. The defendant claimed that using the voter registration list as the sole source for the Los Angeles County jury pool violated his right to a representative cross-section venire. His evidence showed that according to the 1970 census 18.3 percent of Los Angeles County was Hispanic and 10.8 percent Black and in 1975 the respective figures were 21.3 percent and 11.6 percent. By contrast, the percent of Blacks who appeared for jury service in Long Beach (where defendant was tried) was 5.5 and the percent of Hispanics was 3.4. (*People* v. *Harris, supra,* 36 Cal.3d 36, 46-47.)

In *Harris,* Justice Broussard, writing for a plurality,[6] stated: "The problem of narrowing readily available census figures to reflect a population defined to include only those presumptively eligible for jury service raises two fundamental questions presented by this case: Is use of total population figures sufficient to make a prima facie case of a violation of defendant's right to a jury drawn from a representative cross-section of the community? Which party has the burden of showing that a more narrowly defined population would or would not result in a disparity of constitutional consequence? We conclude that because of the difficulty in obtaining more accurate figures for jury eligibility, the defendant can present a prima facie case by showing through the use of total population figures a significant underrepresentation of a cognizable class. The burden then shifts to the state to demonstrate either that with more refined statistics, the underrepresentation would be reduced to a constitutionally insignificant disparity, or that there exists a compelling justification for the procedure which results in the underrepresentation." (*People* v. *Harris, supra,* 36 Cal.3d at pp. 45-46.)

Not only did Justice Broussard sanction the use of gross census data, as indicated by the just quoted passage, for one part of the cross-section comparison but he went on to sanction the venire rather than the "contact pool,"[7] for the other part of the comparison. He said, "[t]he panel which tried defendant was drawn from those jurors who appeared. The representative character of those jurors, not of the 'original contact pool,' is the proper basis for comparison with the county population figures." (36 Cal.3d at p. 53.)

Thus, the plurality opinion in *Harris* approved a comparison of two sets of statistics one of which, the census data, was inaccurate to an unmeasured

---

[6] Chief Justice Bird and Justice Reynoso concurred in the plurality opinion. Justice Grodin "reluctantly" concurred in order to avoid an intolerable no judgment result. (36 Cal.3d at pp. 71-72.)

[7] The "contact pool" consists of those preliminarily selected jurors to whom questionnaires are sent. Of this group only a portion respond, some of whom are exempt and some of whom are excused. The remainder are summoned to appear but only a portion of those summoned actually appear. Those who do appear constitute the venire.

degree.[8] It rejected data over which the jury commissioner had control, viz. the "contact pool," in favor of the other set of statistics, jurors who actually appear for service, over which the jury commissioner has little control.

Justice Mosk, in dissent (joined by Justice Richardson), took sharp issue with the first set of statistics, census data. He wrote, "I perceive no persuasive reason to prevent exclusive reliance on voters' registration lists. . . . These lists include persons who are citizens, of legal age, men and women; they represent all parts of the community, the area and the county; they are drawn from all economic strata, every occupation, all races, religions and political ideologies." (*People* v. *Harris, supra,* 36 Cal.3d at p. 73 (dis. opn. of Mosk, J.).) In deriding alternative lists such as DMV, telephone, automobile registration, welfare rolls, income tax records, etc., he observed that "[n]o statistics have been offered to indicate minorities are better represented on such lists than on voter registration lists, and there is good reason to believe they are not." (*Id.* at p. 74.)

Justice Kaus, in dissent, took issue with the second set of statistics, the venire. He stated, "[t]here is one additional quarrel I have with the plurality opinion: it seems to me that it dismisses much too cavalierly the argument that we should be looking at the original 'contact pool,' rather than the venire." (*People* v. *Harris, supra,* 36 Cal.3d at p. 75 (dis. opn. of Kaus, J.).)

Illustrative of those decisions which, contrary to *Buford* and *Harris,* view critically the mere comparison of census statistics with venire statistics is *People* v. *Alexander* (1985) 163 Cal.App.3d 1189 [210 Cal.Rptr. 306].

In *Alexander* the defendant presented evidence that 5 percent of the Kern County population was Black and 18 percent Spanish surnamed but only 3.2 percent Blacks and 11.8 percent Spanish surnamed persons were present in the jury venire. (163 Cal.App.3d at p. 1199.) A defense expert testified "that the chance of these kinds of disparities occurring on a random basis is only one in ten million for blacks and only one in one million for Spanish surnamed individuals, concluding there must be something causing the disparity other than chance." (*Ibid.*)

The *Alexander* reaction to this statistical comparison and expert opinion was this: "The fact is, without more factual information, accurate conclu-

---

[8] The census data includes persons *not* eligible to be jurors.

Jurors must be citizens of the United States, 18 years of age, domiciled in California and in the county of jury service; free of a felony conviction, English language competent, etc. (Code Civ. Proc., § 203.)

sions regarding the cause of the disparity cannot be drawn and any attribution of the cause is wholly speculative. At a minimum, it should be known what the absolute disparity is between minorities in the general population and the number who appear on the jury venire. To the extent that the absolute disparity may be due to economic, cultural, social or language considerations, the difference must be deemed to be 'unavoidable.' (See *People* v. *Harris, supra,* 36 Cal.3d at p. 59.)

"The process of jury selection is a continuum, involving many steps from the initial selection of the jury pool to the final impanelment of the jury. Along the way there are many opportunities for factors to operate to cause underrepresentation of minorities in the jury venire. The precise extent to which each of the factors operates is unknown. It does appear, however, that some of the factors, at least, are beyond the control of the judiciary and therefore unavoidable." (163 Cal.App.3d at p. 1201.)

*Alexander* also analyzed some of the factors which distort the *Buford-Harris* statistical comparison: fewer minorities register to vote, more minorities are under 18 years of age, more minorities are non-English speaking, and more minorities have been convicted of a felony. (*Ibid.*) The effect of using census statistics, which simply ignore all of these factors, is to "skew[ ] the basic statistics toward showing a larger absolute disparity by an amount unknown. Common experience dictates that the percentage of minorities appearing in the general census figures who are statutorily ineligible for jury service must be large. Yet those ineligible are included in the gross population figures utilized in the statistics presented by appellant." (163 Cal.App.3d at p. 1202.)

The conflict between the *Buford-Harris* approach, on the one hand, and the *Alexander* approach, on the other, has been resolved. The near unanimous[9] opinion in *People* v. *Morales, supra,* 48 Cal.3d 527, makes clear that statistical comparisons, such as in *Buford* and *Harris,* do *not* establish a prima facie cross-section violation. ■ *Morales* states, "Like the dissent in *Buford,* we believe that a prima facie case of systematic exclusion or underrepresentation of a distinctive class is not made merely by demonstrating that the county's race/class *neutral* jury selection processes may nonetheless operate to permit the de facto exclusion of a higher percentage of a particular class of jurors than would result from a random draw." (*Id.* at p. 546.)

In *Morales* the defendant's evidence showed that Hispanics constituted 18.26 percent of the Ventura County population but only 10.71 percent and

---

[9] Only Justice Broussard, the author of the plurality *Harris* opinion, dissented.

8.73 percent of two recent venires. A defense statistician testified that the random chances of these venire disparities were, respectively, one in one thousand and one in ten thousand. (48 Cal.3d at p. 542.)

On appeal, defendant additionally urged that Ventura County's "lax jury selection processes" caused the unconstitutional disparity. (48 Cal.3d at p. 542.)

In Ventura County, just as the record shows was done in the instant case by Los Angeles County, the county draws prospective jurors from a pool of persons whose names appear on voter registration lists and DMV records. (48 Cal.3d at p. 542.) "A computer randomly selects prospective jurors from the pool without regard to race or national origin. Exemptions or excuses are available for such reasons as advanced age, nonresidency, difficulty with the English language, lack of sufficient intelligence, prior felony convictions, travel distance, lack of adequate transportation, extreme financial hardship, physical or mental incapacity, and public health or safety factors." (*Ibid.*; see Cal. Standards Jud. Admin., § 4.5 [West's Cal. Ann. Codes, Rules (Appen.) (1989 Supp.) pp. 279-280; Deering's Cal. Ann. Codes, Rules, p. 590].)

In exercising his discretion, according to evidence presented by the defendant in *Morales,* the Ventura County jury commissioner, during the week when only 8.73 percent of the venire were Hispanics, excused 103 summoned jurors for lack of transportation and 233 for extreme financial hardship. (48 Cal.3d at p. 543.) This total of 336 excused jurors was almost 80 percent as many as the 424 jurors who appeared. (*Ibid.*)

Based upon these statistics defendant made a claim characterized this way in *Morales*: "Defendant, offering no specific evidence on the subject, speculates that a large number of these excused persons were Hispanics, and that the disparity disclosed by his statistics may well be the result of the county's failure to enforce more vigorously its jury selection program." (48 Cal.3d at p. 543.)

The danger of such speculation and the court's unwillingness to indulge in it is reflected by its approving comments about and quotations from *People* v. *Alexander*: "*Alexander* concluded that because of the difficult proof problems in these cases, we should hesitate to assume too readily that the statistical disparity is attributable to causes over which the courts have control. 'In reality, it may well be that the amount of the absolute disparity attributed to the procedure of informally excusing jurors is infinitesimal and inconsequential when compared to the other major causes of such disparity.

Only further proof and factual information will clarify the significance of the practices utilized in excusing jurors. At this point, attributing the statistical disparity entirely to the practice of orally excusing jurors for undue hardship without written standards would not appear to be justified. *Nor should an assumption of such speculative causation serve as a basis for reversal of a criminal conviction.'* ([163 Cal.App.3d at p.] 1203, italics added.)" (*People* v. *Morales, supra,* 48 Cal.3d at p. 548.)

■ Appellant makes substantially the same claim rejected in *Morales.*

At his motion to quash the jury venire appellant called Raymond Arce, Director, Office of the Jury Commissioner, Los Angeles Superior Court. Mr. Arce described the multi-step juror selection process, essentially identical to Ventura County's as described in *Morales,* and indicated that according to the 1980 census adult Blacks constitute 11.4 percent of the Los Angeles County population and 15.7 percent of the population within a 20-mile radius of the Norwalk courthouse (where appellant was tried). A 1986 survey indicated that only 4.5 percent of Norwalk's jurors were Black.

Recognizing that just such a statistical disparity was held inadequate in *Morales,* appellant seeks to distinguish the showing made in *Morales* with his evidence that the jury commissioner "directly and immediately" (48 Cal.3d at p. 546) caused the disparity.

His argument is this: if jurors were summoned to the Norwalk courthouse without having to compete with the other 11 courthouses within its 20-mile radius, there would be more Black jurors in Norwalk.[10] Additionally, if the requests, by 20-25 percent of jurors summoned to Norwalk, to be reassigned to a closer or more convenient courthouse[11] were denied then there would be more Black jurors in Norwalk.

This argument is ill taken for many reasons. It disregards all the likely and unavoidable causes for the initial disparity. It ignores the fact that there are 33 courthouses in Los Angeles County each with a need for jurors. The commissioner must harmonize and accommodate all their needs. No evi-

---

[10] Jurors are randomly selected from a county-wide pool but summoned to that courthouse, in need of jurors, nearest their residence. At one time three courthouses, by court order, had the commissioner summon jurors "without competition" from other courthouses. No such order obtained with respect to Norwalk.

[11] Mr. Arce testified that jurors living in South Central Los Angeles can conveniently take a single bus to the downtown Los Angeles courthouse, a courthouse which commands 34 percent of the county's jurors. But to get to Norwalk from South Central Los Angeles requires two or three buses and upwards of two hours.

dence was offered that it is *possible* to operate a system where 184,940 jurors are summoned to 33 courthouses, yet each courthouse summons is isolated from the other 32. If such a summons juggling were possible no showing was made that Norwalk would have more Black jurors.[12] The dubious benefits would be outweighed by the almost certain detriments: instead of the present 13 percent county-wide Black juror participation (compared to the county's 11.4 percent Black population) there would be fewer Blacks willing to serve if it meant travelling further, at greater expense, with more wasted time. Moreover, as Justice Mosk commented in a similar context, if such a juror were "reluctantly compelled to perform jury service he would in all likelihood not be a conscientious juror, a circumstance that might adversely affect a criminal defendant's right to be tried by a serious and objective trier of fact." (*People* v. *Harris, supra,* 36 Cal.3d at p. 74 (dis. opn., Mosk, J.).) Finally, it overlooks the fact that no court order authorized the jury commissioner to summon jurors to Norwalk without competition from the 11 overlapping courthouses.

Appellant's related argument concerning juror reassignment requests is utterly speculative. No evidence was presented that any juror was reassigned except for reasons of "undue hardship." (Code Civ. Proc., § 200, repealed by Stats. 1988, ch. 1245, § 1. See Code Civ. Proc., § 204, subd. (b).)

The speculativeness and insubstantiality of appellant's argument is further underscored by Mr. Arce's testimony. When asked about the effects of instituting such a competition free juror summoning process for Norwalk, he testified as follows: "My opinion is that there *might* be some marginal improvement a percent or two, maybe half a percent." (Italics added.)

We believe it is precisely such speculation Chief Justice Lucas disapproved when he emphasized this sentence from *Alexander* : *"Nor should an assumption of such speculative causation serve as a basis for reversal of a criminal conviction."* (*People* v. *Morales, supra,* 48 Cal.3d at p. 548.)

If *Morales* did not make clear that appellant failed to make a prima facie showing of cross-section violation, *People* v. *Bell* (1989) 49 Cal.3d 502 [262 Cal.Rptr. 1, 778 P.2d 129] does. It affirms and extends *Morales* by holding "that when a county's jury selection criteria are neutral with respect to race, ethnicity, sex, and religion, more is required to shift the burden to the People. The defendant must identify some aspect of the manner in which

---

[12] Appellant's claim contemplates freedom of juror competition for Norwalk but *not* freedom of competition for the other 32 courthouses. Such a claim can have no constitutional basis.

those criteria are being applied that is: (1) the probable cause of the disparity, and (2) constitutionally impermissible." (*Id.* at p. 524.)

Appellant no more showed "the probable cause of the disparity" and that it was "constitutionally impermissible" than did the defendant in *People* v. *Bell.* In *Bell* the defendant speculated, just as appellant does, that "the allegedly informal manner in which hardship deferrals were granted to prospective jurors was a factor" in the disparity "but he offered no evidence that Blacks sought or were granted deferral on grounds of hardship in greater relative numbers than members of other groups." (48 Cal.3d at p. 528.) *Bell* holds that the defendant's mere statistical evidence of disparity failed to make a prima facie showing of cross-section venire violation.

Except for a greater degree of speculation by appellant, the instant case cannot be distinguished from the showing held inadequate in *Bell.*

We hold that appellant failed to make a prima facie showing his right to a representative cross-section venire was violated. The trial court properly denied his motion to quash the jury venire.

2. *He was denied effective assistance of counsel at an in-court "lineup."*

A defendant has a right to counsel at a pretrial lineup (*United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]) and to have counsel present immediately after the lineup when the witness is asked to make an identification (*People* v. *Williams* (1971) 3 Cal.3d 853 [92 Cal.Rptr. 6, 478 P.2d 942]). He also has a right, prior to any in-court identification, to request a lineup. (*Evans* v. *Superior Court* (1974) 11 Cal.3d 617 [114 Cal.Rptr. 121, 522 P.2d 681].)

Appellant, prior to the instant trial, requested a lineup. His purpose was clear and justified: Richard Denham was an eyewitness to the robbery but had not testified at the preliminary hearing nor at the first trial. Therefore, absent a lineup, Mr. Denham's first identification effort would be during trial, with appellant sitting at counsel table, marked as the accused. The trial court granted appellant's request and ordered that a pretrial lineup be conducted with Mr. Denham attending.

The sheriff's department made the lineup arrangements. From 10 to 15 county jail inmates were preliminarily selected to participate in the lineup

with appellant. They were selected based upon their having characteristics similar to appellant. As noted on the sheriff's department form those characteristics were: race, age, height, weight, hair color, eye color, facial hair (moustache, beard, and scalp hair), and dark skin color.

On January 29, 1987, all lineup arrangements having been made, both Mr. Denham and appellant's counsel present, Sheriff's Deputy Fernandez selected those five inmates most closely resembling appellant. It was then that appellant refused to participate in the lineup. Appellant was allowed to privately confer with his counsel. After this consultation he still refused to participate[13] and the lineup was therefore cancelled.

The lineup having been cancelled, the prosecutor made arrangements to have Mr. Denham come to the courtroom, sit down, look at persons in the courtroom and persons who entered the courtroom, and if he saw the robber to so indicate.

Before these arrangements were implemented appellant's mother apparently overheard them being discussed. She informed appellant's counsel.

This information triggered an in chambers discussion between the trial judge and both counsel. The discussion was not reported. This is what occurred. Mr. Ramirez, appellant's attorney, believing that the prosecutor intended to show Mr. Denham a *photo* lineup asked the court to order his clerk not to have appellant brought into the courtroom until after Mr. Denham saw the photo lineup. Apparently no inquiry was made of the prosecutor. The court so instructed his clerk.

Both counsel departed chambers but the prosecutor shortly returned, informed the court he was *not* going to show any photographs to Mr. Denham and requested that the court direct the bailiff to bring appellant into the courtroom. The court, understanding that the concerns of Mr. Ramirez, appellant's trial counsel, were now moot since there was to be no photo lineup, so directed his bailiff.

During these brief discussions between counsel and the trial court, Mr. Denham sat by himself in the courtroom. Since he had not been told where the suspect might be or might come from, he looked around the courtroom. During the 5-10 minutes he sat there he saw about 15 people of various races including Blacks. It was apparently early in the morning and several

---

[13]His reason, as told to Deputy Fernandez, and as recorded by appellant on the lineup form, was that the other participants were too light complected.

cases were called. The bailiff brought out a Black defendant, returned him, brought out a White defendant, returned him, and again brought out the same Black defendant, and again returned him. Then, with appellant's counsel present in the courtroom,[14] appellant wearing civilian clothes, the bailiff brought out appellant. In the words of Mr. Denham, "our eyes met. It was instantaneous." Mr. Denham, as arranged, indicated he had seen the robber.

■ It was this in-court "lineup" that appellant claims violated his right to counsel.

His claim is less meritorious than that urged in *People* v. *Green* (1979) 95 Cal.App.3d 991 [157 Cal.Rptr. 520]. There, during a preliminary hearing, defense counsel requested that the defendants be absent in order to prevent a suggestive in-court identification. Initially the court acceded. But after the defendants "expressly refrained from requesting that an in-court lineup be conducted" (*id.* at p. 1002) the court ordered the defendants to be present. The victim then made an in-court identification of them.

In rejecting defendants' claim of error the appellate court stated, "If a criminal defendant *anticipates* that an in-court identification may be suggestive, he has a readily available remedy to avert any prejudice expected to result from the courtroom showup procedure: he may demand that a lineup be conducted preliminary to any in-court identification. (*Evans* v. *Superior Court* [1974] 11 Cal.3d 617, 625 [114 Cal.Rptr. 121, 522 P.2d 681]; *People* v. *Vallez* [1978] 80 Cal.App.3d 46, 56 [143 Cal.Rptr. 914].) However, where, as here, a defendant knowingly and deliberately *rejects* the preliminary availability of a lineup as a tactic merely to forestall a legitimate identification by a victim in court, objections should be deemed as waived. Here, Dean was well aware prior to the in-court identification made by Mrs. Emery on January 6, 1977, of his right to request a lineup. He specifically refused to exercise this right. Consequently, he should not be heard to complain now that the identification at the hearing made by Mrs. Emery was tainted by the suggestiveness of the circumstances in the courtroom. We hold that both the magistrate and the superior court properly concluded that the identification procedure in question did not violate Dean's due process rights." (95 Cal.App.3d at p. 1004.)

Appellant, like the defendants in *Green,* anticipated a suggestive in-court identification. Unlike the defendants in *Green,* he asked for and was provid-

---

[14] The prosecutor's representation was not contradicted, although Mr. Ramirez stated he was unaware that Mr. Denham was present in the courtroom.

ed a carefully arranged lineup. At the 11th hour, after being allowed to privately confer with counsel, he then spurned that lineup. "[H]e should not be heard to complain now that the identification . . . was tainted by the suggestiveness of the circumstances in the courtroom." (95 Cal.App.3d at p. 1004.) Nor should he be heard to complain that his *Williams* right to counsel was violated when Mr. Denham instantaneously identified appellant.

Not only does appellant fail to point out any unfairness in the in-court "lineup" but from all indications it was less suggestive than the most likely alternative, a one person lineup with Mr. Denham sitting in the witness box and appellant seated in the chair of the accused.

We find no denial of effective assistance of counsel at the in-court "lineup."

3. *He was denied equal protection by the court's trial transcript orders.*

Although a mistrial had been declared on November 17, 1986, and a new trial date set for January 22, 1987, appellant's counsel delayed until January 15, 1987, his request that a transcript of the first trial be prepared. The trial court conferred with the court reporter, learned that a transcript could not be prepared until well after the trial date, and denied the request as untimely.

Later, during trial, the court granted the prosecutor's request for a partial transcript of the first trial.

Appellant contends, without citation of authority, that the trial court's two orders "smack[ ] of a denial of equal protection of the laws."

Without belaboring the matter we briefly observe: the request for the trial transcript was made by counsel who had represented appellant at and was familiar with the first trial; neither to the trial court nor on appeal has a showing of good cause for the preparation of the trial transcript been made; preparation of the partial transcript requested by the prosecutor caused no trial delay; appellant was provided a copy of that partial transcript; appellant obtained, without court order, an additional partial transcript; appellant does not identify any witness inconsistency and fails to cite any effect let alone prejudice from the court's orders.

We find the contention without merit.

## DISPOSITION

The judgment is affirmed.

Lillie, P. J., concurred.

**JOHNSON, J.**—I concur in the result reached by the majority in view of *Williams* v. *Superior Court* (1989) 49 Cal.3d 736 [263 Cal.Rptr. 503, 781 P.2d 537]. That case held, for purposes of determining whether a jury represents a cross-section of the community, the "community" is the judicial district. There is no evidence in the case before us Blacks are underrepresented on Norwalk Superior Court juries in relation to the number of jury eligible Blacks within the Southeast Judicial District. (Cf. *Williams* v. *Superior Court, supra,* at p. 746.)

In light of the holding in *Williams,* everything in the majority opinion except footnote 5, (*ante,* p. 559) is dicta. However, because some of that dicta involves the county's policy of reassigning jurors because of transportation difficulties in getting to their assigned court, I write separately to express my view that the current policy would not rebut a future defendant's prima facie showing of a violation of the fair-cross-section requirement.

Once the defendant establishes a prima facie case, see majority opinion at page 558, the burden shifts to the state to demonstrate a sufficiently compelling interest to maintain that systematic exclusion. (*Duren* v. *Missouri* (1979) 439 U.S. 357, 367-368 [58 L.Ed.2d 579, 99 S.Ct. 664].)

According to Mr. Arce, Director of Juror Services for Los Angeles County, a person who objects to service at the assigned court because a lack of transportation, or reliance on public transportation, would create an inconvenience in getting to that court is reassigned to a more convenient court.[1] Los Angeles's legendary lack of adequate public transportation is the primary cause of juror transfers. Mr. Arce testified, "For example, let's assume that a Black person from South Central is summoned to this court, and indicates that he or she relies on public transportation. Our experience has been that public transportation from the South Central area of Los Angeles to this court is very difficult. It takes upwards of two hours, as I recall, either one or two bus changes, and it's just not easy to accomplish."

---

[1] Technically, such a person is not excused from jury service, only reassigned. However, for purposes of the fair-cross-section requirement the result is the same.

He also pointed out, "A In as much [*sic*] as the Rapid Transit District—Southern California Rapid Transit District has several lines from the outlying portion of the county—parts of the county, including the South Central area, traveling to the hub, that is downtown, the availability going on any one of the streets—major streets, such as Figueroa, Main Street, Vermont, Normandie, and getting to the South Central—to the downtown courthouse is much easier than it is going, say, for example, from—from the South Central area, the Compton/Carson area, than it is to this court.

"Also, bus lines such as the Torrence [*sic*] bus line, or the Santa Monica bus line have as their objectives transportation between say Santa Monica—the City of Santa Monica, and points there in downtown, or from the City of Torrence [*sic*], downtown, you don't find the Torrence [*sic*] bus line serving residents of Torrence [*sic*], in taking them to Norwalk, for example."

Mr. Arce testified his office does not record the race of jurors reassigned due to transportation problems. However, he did testify that between 20 and 25 percent of the jurors summoned to the Norwalk Superior Court are granted transfers based on transportation difficulties. Assuming all races are equally affected by inadequate public transportation, which may be a conservative assumption as to Blacks, the Norwalk Superior Court is losing 20 to 25 percent of its potential Black jurors as a result of the county's juror transfer policy.

Under the holding in *Duren,* the state may justify the systematic underrepresentation of a cognizable class by proof "that a significant state interest [is] manifestly and primarily advanced by" its exemption criteria. (439 U.S. at p. 367 [58 L.Ed.2d at p. 589].) The court did not further define what it meant by a "significant" interest except " '[t]he right to a proper jury cannot be overcome on merely rational grounds.' " (*Ibid.,* quoting *Taylor* v. *Louisiana* (1975) 419 U.S. 522, 534 [42 L.Ed.2d 690, 700, 99 S.Ct. 692].) A "significant" state interest appears to be something less than a "compelling" one but something more than a merely "rational" one. (See *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 17 [36 L.Ed.2d 16, 33, 93 S.Ct. 1278].) Thus, applying Fourteenth Amendment equal protection analysis to Sixth Amendment fair-cross-section cases, I believe the showing the government must make to establish a "significant" state interest is analogous to the showing it must make when its classifications involve important but not "fundamental" rights or sensitive but not "suspect" classifications. (See, e.g., *Craig* v. *Boren* (1976) 429 U.S. 190 [50 L.Ed.2d 397, 97 S.Ct. 451] [classification based on gender]; *Mills* v. *Habluetzel* (1982) 456 U.S. 91 [71 L.Ed.2d 770, 102 S.Ct. 1549] [classification based on

illegitimacy]; *Plyler* v. *Doe* (1982) 457 U.S. 202 [72 L.Ed.2d 786, 102 S. Ct. 2382] [classification based on alienage].) To withstand constitutional challenge, such classifications must serve "important governmental objectives and must be substantially related to achievement of those objectives." (*Craig* v. *Boren, supra,* 429 U.S. 190, 197 [50 L.Ed.2d 397, 407].)

This heightened scrutiny of governmental objectives is consistent with the treatment the court gave gender-based juror exclusion rules in *Taylor* v. *Louisiana, supra,* 419 U.S. 522, 534 [42 L.Ed.2d 690, 700] and *Duren* v. *Missouri, supra,* 439 U.S. at pages 368-369 [58 L.Ed.2d at pages 589-590]. While acknowledging the state could assert a rational basis for excluding women from juries,[2] the court stated, in *Taylor,* "It is untenable to suggest these days that it would be a special hardship for each and every woman to perform jury service or that society cannot spare *any* women from their present duties." (419 U.S. at pp. 534-535 [42 L.Ed.2d at pp. 700-701] [italics in original].) In *Duren* the court held that if it turned out on remand that exemptions for persons over 65, teachers and government workers caused the low percentage of women on jury venires the state would have to establish those exemptions "manifestly and primarily advanced" a "significant state interest." (439 U.S. at pp. 367-368 [58 L.Ed.2d at p. 589].)

It is not contended the government lacks a significant interest in providing prospective jurors exemptions for "undue hardship." Such exemptions clearly promote significant political and practical interests of the state and have been approved in principle in numerous cases. (See, e.g., *Taylor* v. *Louisiana, supra,* 419 U.S. at p. 534 [42 L.Ed.2d at p. 700] [approving exemptions "in case of special hardship"]; *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 224 [90 L.Ed. 1181, 1186-1187, 66 S.Ct. 984, 166 A.L.R. 1412] [approving exemptions for "undue financial hardship"]; *People* v. *Milan* (1973) 9 Cal.3d 185, 196 [107 Cal.Rptr. 68, 507 P.2d 956] [approving excusing jurors for "economic hardship"].) But even though the government has a significant interest in providing exemptions in cases of undue hardship, these exemptions must be tailored to "manifestly and primarily advance" that interest. (*Duren* v. *Missouri, supra,* 439 U.S. at p. 367 [58 L.Ed.2d at p. 588].) Mere administrative convenience does not justify a blanket exclusion which results in the underrepresentation of a cognizable class. (*Taylor* v. *Louisiana, supra,* 419 U.S. at pp. 534-535 [42 L.Ed.2d at pp. 700-701].) The court, in *Taylor,* rejected the argument a "special hardship" resulting from a woman's duty in the home justified excluding women from juries. The court responded to this argument by stating, "This may be the case with many, and it may be burdensome to sort out those who should be exempted from those who should serve. But . . . the administrative

---

[2] See *Hoyt* v. *Florida* (1961) 368 U.S. 57, 62-63 [7 L.Ed.2d 118, 122-123, 82 S.Ct. 159].

convenience in dealing with women as a class is insufficient justification for diluting the quality of community judgment represented by the jury in criminal trials." (*Id.* at p. 535 [42 L.Ed.2d at p. 701].)

Furthermore, the standards for applying the exemption must be substantially related to achievement of the exemption's objective. (*Craig* v. *Boren, supra,* 429 U.S. at p. 197 [50 L.Ed.2d at pp. 406-407].) In *Thiel* v. *Southern Pacific Co., supra,* 328 U.S. at page 224 [90 L.Ed.2d at page 1187], the court held the permissible objective of excusing daily wage earners from jury service, where such service would constitute an undue financial hardship, could not be achieved by a blanket exclusion of all daily wage earners. "Here," the court observed, "there was no effort, no intention, to determine in advance which individual members of the daily wage earning class would suffer an undue hardship. . . . All were systematically and automatically excluded." In *Duren* v. *Missouri, supra,* the court held exempting all women from jury service "because of the preclusive domestic responsibilities of some women is insufficient justification of their disproportionate exclusion on jury venires." (439 U.S. at p. 369 [58 L.Ed.2d at p. 590].) If the state wished to excuse men or women responsible for the care of children "[a]n exemption appropriately tailored to this interest would . . . survive a fair-cross-section challenge." (*Id.* at p. 370 [58 L.Ed.2d at p. 590].)

There is no basis in logic for concluding every bus rider would incur "undue hardship" if required to serve as a juror at the Norwalk Superior Court. Yet, the county policy, as explained by Mr. Arce, makes this assumption because it allows any juror to opt out of service in Norwalk by merely asserting "it would be a hardship for me to get to that court." (Cf. *Duren* v. *Missouri, supra,* 439 U.S. at p. 369 [58 L.Ed.2d at p. 590].) A juror making such an assertion is asked, "Which courts would be easiest [for you to go to]?" The juror is transferred to the court she names as easiest to go to. Nothing in the record before us suggests the county's transfer policy is limited to cases of excessive travel time or unreasonable difficulty in using public transportation. On the contrary, the county's policy appears to be based on inconvenience, not undue hardship.[3] The juror is allowed to serve at whichever court is "easiest" for her. So far as I can ascertain from the record the transfer is self-executed by the juror. No written verification is required. No check of bus routes or times is made.

---

[3] At the hearing on Harmon's motion the prosecutor argued, "I think what [the county is] doing is the best [it] possibly can, under the circumstances. Jurors are human beings. They don't want to drive any farther than they have to. They don't want to be on the bus any longer than they have to. They don't want to be away from their homes and jobs anymore than they have to."

Avoiding mere inconvenience to jurors is not a significant state interest justifying denial of the constitutional right to a jury drawn from a fair cross-section of the community. As the court stated in *Thiel, supra,* "Jury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a plea of inconvenience . . . ." (328 U.S. at p. 224 [90 L.Ed.2d at p. 1187].) (See also *Adams* v. *Superior Court* (1972) 27 Cal.App.3d 719, 728 [104 Cal.Rptr. 144] observing policies arrived at minimizing inconvenience to jurors must give way to compliance with the constitutional requirement of a fair cross-sectional jury selection.) By allowing jurors to transfer to the "easiest" courthouse the government has abdicated its responsibility to set and follow standards appropriately tailored to its legitimate interest in avoiding undue hardship to jurors. This transfer policy could, in a future case, result in the denial of a defendant's constitutional right to a jury which represents a fair cross-section of the community.

Appellant's petition for review by the Supreme Court was denied March 1, 1990.